FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

GEOD CORPORATION, CHRISTOPHER
EMILIUS, JOHN F. EMILIUS, PAUL J.
EMILIUS, JR., and  STANLEY PALINSKI,

                                    Plaintiffs,

                    v.

NEW JERSEY TRANSIT CORPORATION,
ET AL.,

                                    Defendants.

Civil Action No. 2:04-cv-2425 (SDW)

**OPINION**

October 19, 2010

**WIGENTON**, District Judge.

        Before the Court is Plaintiffs', GEOD Corporation ( "GEOD"), Christopher Emilius,

John F. Emilius, Paul J. Emilius, Jr. and Stanley Palinski, complaint against the remaining

defendant, New Jersey Transit Corporation ("NJ Transit"), alleging violations of the Fourteenth

Amendment of the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C.

§ 1331, 28 U.S.C. § 1343, 28 U.S.C. § 2201, and 28 U.S.C. § 1367.  Venue is proper pursuant to

28 U.S.C. § 1391(b).  This Court held a bench trial from March 8, 2010 through March 12, 2010,

and on March 22, 2010, March 24, 2010, March 25, 2010, and March 26, 2010.  For the reasons

detailed below, this Court finds in favor of Defendant.

## PROCEDURAL HISTORY

        The individual plaintiffs in this matter, who are the owners of GEOD, are white males.

(Am. Compl. ¶ 4, Oct. 6, 2004.)  GEOD is a closely held corporation with its principal place of

business in Newfoundland, New Jersey.  (Am. Compl. ¶¶ 4, 6.)  More than 51 percent of the

issued and outstanding shares of the corporation are owned by white male members of the Emilius Family and the remaining 10 percent of shares are owned by Stanley Palinski.  (Am. Compl. ¶¶ 9-12.)  Generally, GEOD provides services conducting aerial photography, topographic mapping, surveying, and photogrammetric services to prime contractors and subcontractors working on projects for NJ Transit.  (Trial Tr. vol. 1, 50-52, 69-70, Mar. 8, 2010.) GEOD's main competitors, who also provide the same services for contractors, are certified Disadvantaged Business Enterprises, owned by sub-continent Asian companies.  (Trial Tr. vol. 1, 52.)  GEOD has worked on projects for the New Jersey Department of Transportation, agencies of the State of New Jersey, and the Port Authority of New York and New Jersey.  (Trial Tr. vol. 1, 77.)  GEOD has performed professional services for NJ Transit as a sub-contractor or sub-consultant. (Trial Tr. vol. 1, 50-51, Mar. 8, 2010.)

This action arises from allegations by Plaintiffs of discriminatory practices by Defendant in designing and implementing an affirmative action program that uses race, ethnicity, national origin and sex as criteria in selecting subcontractors and consultants for its construction projects in New Jersey.  (Am. Compl. ¶ 21.)  Plaintiffs filed a complaint on May 25, 2004. Plaintiffs then filed an amended complaint on October 6, 2004. Plaintiffs allege discrimination by NJ Transit based on Plaintiffs' race, national origin, ethnicity and sex.  (Am. Compl. ¶1.)

In their amended complaint, Plaintiffs allege that the NJ Transit Disadvantaged Business Enterprise ("DBE") Program violates the Fifth and Fourteenth Amendments of the United States Constitution, 42 U.S.C. § 1981, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d), Article 1, ¶¶ 1 and 5 of the Constitution of the State of New Jersey, and the New Jersey Law Against Discrimination, N.J.S.A. 10:2-1, *et seq*. and 10:5-32, *et seq*.  (Am. Compl. ¶ 1.)  After motions to dismiss and for summary judgment were decided, this Court dismissed the complaint

against all Defendants except for NJ Transit and concluded that a genuine issue of material fact existed only as to whether the method used by NJ Transit to determine its DBE goals during 2010 were sufficiently narrowly tailored, and thus constitutional.  (Trial Tr. vol. 1, 16.)

**FINDINGS OF FACT**

**FEDERAL STATUTES AND REGULATIONS**

In order to reach its stated objective of  "ensur[ing] nondiscrimination in the award and administration of [Department of Transportation]-assisted contracts," the United States Department of Transportation ("USDOT" or "DOT") requires that recipients of USDOT funds awarding prime contracts exceeding $250,000 in funds allocated under the Transportation Equity Act for the Twenty First Century ("TEA-21") establish a disadvantaged business enterprise program.  SAFETEA-LU, Pub. L. No. 109-59, 119 Stat. 1144 (2005) (SAFTEA-LU is the successor to TEA-21)[1]; TEA-21, Pub. L. No. 105-178, 112 Stat. 107 (1998); 49 C.F.R. § 26.21. This requirement was extended by the successor to TEA-21, the Safe, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU").  Pub. L. No. 109-59, 119 Stat. 1144 (2005); *see also* H.I.R.E. Act, Pub. L. No. 111-147, 124 Stat. 71 (2010) (extending SAFETEA-LU).  TEA-21 requires that "not less than 10 percent of the amounts made available for any program under Titles I, III, and V of this Act shall be expended with small business concerns owned and controlled by socially and economically disadvantaged individuals."  Pub. L. No. 105-178, 112 Stat. 107 (1998).  The 10 percent goal is aspirational and the regulations do not authorize or require that recipients of USDOT funds reach any particular goal.  49 C.F.R. § 26.41(b).

---

[1] Since both parties and the case law refer to this set of federal statutes and regulations as "TEA-21," this opinion will use that language to reference both the original TEA-21 and its successors.

Both TEA-21 and SAFETEA-LU incorporate the Small Business Act ("SBA")

definitions for "small business concern" and "socially and economically disadvantaged

individuals.  Pub. L. No. 109-59, 119 Stat. 1144; Pub. L. No. 105-178, 112 Stat. 107.  A small

business concern "shall be deemed to be one which is independently owned and operated and

which is not dominant in its field of operation" and which has annual receipts and a number of

employees below a certain threshold established by SBA regulations.  15 U.S.C. § 632; 49

C.F.R. § 26.65.  "Socially disadvantaged individuals are those who have been subjected to racial

or ethnic prejudice or cultural bias because of their identity as a member of a group without

regard to their individual qualities."  15 U.S.C. § 637(a)(5).  "Economically disadvantaged

individuals are those socially disadvantaged individuals whose ability to compete in the free

enterprise system has been impaired due to diminished capital and credit opportunities as

compared to others in the same business area who are not socially disadvantaged."  15 U.S.C. §

637(a)(6)(A).  A "'small business concern owned and controlled by socially and economically

disadvantaged individuals' shall mean a small business concern . . . 'which is at least 51 per

centum owned by one or more socially and economically disadvantaged individuals'" and

"whose management and daily business operations are controlled by one or more of such

individuals."  15 U.S.C. § 637(d)(3)(C).

The regulations require that agencies receiving funds ("recipients") make a rebuttable

presumption that "women, Black Americans, Hispanic Americans, Native Americans, Asian-

Pacific Americans, Subcontinent Asian Americans, or other minorities found to be

disadvantaged by the SBA, are socially and economically disadvantaged individuals."[2]  49

_____

[2] Under 49 C.F.R. § 26.67, socially and economically disadvantaged classification are as follows:

C.F.R. § 26.67 (a)(1).  However, recipients of funds may make case-by-case determinations that "[f]irms controlled by individuals who are not presumed to be socially and economically disadvantaged" still qualify for DBE certification.  49 C.F.R. § 26.67(d).  Also, the socially and economically disadvantaged individual cannot have a net worth in excess of $750,000, excluding

---

(1) Any individual who a recipient finds to be a socially and economically disadvantaged individual on a case-by-case basis.

(2) Any individual in the following groups, members of which are rebuttably presumed to be socially and economically disadvantaged:

      (i) "Black Americans," which includes persons having origins in any of the Black racial groups of Africa;

      (ii) "Hispanic Americans," which includes persons of Mexican, Puerto Rican, Cuban, Dominican, Central or South American, or other Spanish or Portuguese culture or origin, regardless of race;

      (iii) "Native Americans," which includes persons who are American Indians, Eskimos, Aleuts, or Native Hawaiians;

      (iv) "Asian-Pacific Americans," which includes persons whose origins are from Japan, China, Taiwan, Korea, Burma (Myanmar), Vietnam, Laos, Cambodia (Kampuchea), Thailand, Malaysia, Indonesia, the Philippines, Brunei, Samoa, Guam, the U.S. Trust Territories of the Pacific Islands (Republic of Palau), the Commonwealth of the Northern Marianas Islands, Macao, Fiji, Tonga, Kirbati, Juvalu, Nauru, Federated States of Micronesia, or Hong Kong;

      (v) "Subcontinent Asian Americans," which includes persons whose origins are from India, Pakistan, Bangladesh, Bhutan, the Maldives Islands, Nepal or Sri Lanka;

      (vi) Women;

      (vii) Any additional groups whose members are designated as socially and economically disadvantaged by the SBA, at such time as the SBA designation becomes effective.

"an individual's ownership interest in the applicant firm," and the equity in his or her primary residence.  49 C.F.R. § 26.67(a)(2).

## GOAL SETTING PROCESS

Federal regulations also set the procedure for determining the goals for DBE participation.  49 C.F.R. § 26.45.  Recipients must base their overall goal on the "relative availability of DBEs" that is "demonstrable evidence of the availability of ready, willing and able DBEs relative to all businesses ready, willing and able to participate on [the recipient's] DOT-assisted contracts."  49 C.F.R. § 26.45(b).  Although the regulations require the creation of goals for DBE participation, recipients cannot be penalized if their DBE participation falls short of their overall goal as long as their program has been administered in good faith.  49 C.F.R. § 26.47(a).

Recipients must first begin their "goal setting process by determining a base figure for the relative availability of DBEs."  49 C.F.R. § 26.45(c).  Several methods or a combination of methods may be used to determine the base figure.  49 C.F.R. § 26.45(c).  These include, but are not limited to: use of DBE directories and Census Bureau data; use of a bidders list; use of data from a disparity study; use of goals of another DOT recipient; and/or alternative methods "based on demonstrable evidence of local market conditions and [] designed to ultimately attain a goal that is rationally related to the relative availability of DBEs in [the recipient's] market."  49 C.F.R. § 26.45(c)(1-4) (this regulation specifies that the "examples are not intended as an exhaustive list").

Next, the recipient "must examine all of the evidence available in [their] jurisdiction to determine what adjustment, if any, is needed to the base figure in order to arrive at [the] overall

goal." 49 C.F.R. § 26.45(d).  In adjusting the base figure, the recipient must consider "many types of evidence" including:

> (1) The current capacity of DBEs to perform work in your DOT-assisted contracting program, as measured by the volume of work DBEs have performed in recent years;
>
> (2) Evidence from disparity studies conducted anywhere within your jurisdiction, to the extent it is not already accounted for in your base figure; and
>
> (3) If your base figure is the goal of another recipient, you must adjust it for differences in your local market and your contracting program.
>
> [49 C.F.R. § 26.45(d)(1).]

Also, available "evidence from related fields that affect the opportunities for DBEs to form, grow and compete" must be considered.  49 C.F.R. § 26.45(d)(2).  These include, but are not limited to:

> (1) Statistical disparities in the ability of DBEs to get the financing, bonding and insurance required to participate in your program;
>
> (2) Data on employment, self-employment, education, training and union apprenticeship programs, to the extent you can relate it to the opportunities for DBEs to perform in your program.
>
> [49 C.F.R. § 26.45(d)(2).]

Once the goals are established, the maximum feasible portion must be met by the use of race-neutral means.  49 C.F.R. § 26.51(a).  The regulations state that race-neutral means include but are not limited to:

> (1) Arranging solicitations, times for the presentation of bids, quantities, specifications, and delivery schedules in ways that facilitate DBE, and other small businesses . . .;
>
> (2) Providing assistance in overcoming limitations such as inability to obtain bonding or financing . . .;

(3) Providing technical assistance and other services;

(4) Carrying out information and communications programs on contracting procedures and specific contract opportunities . . . ;

(5) Implementing a supportive services program to develop and improve immediate and long-term business management, record keeping, and financial and accounting capability for DBEs and other small businesses;

(6) Providing services to help DBEs, and other small businesses, improve long-term development, increase opportunities to participate in a variety of kinds of work, handle increasingly significant projects, and achieve eventual self-sufficiency;

(7) Establishing a program to assist new, start-up firms, particularly in fields in which DBE participation has historically been low;

(8) Ensuring distribution of your DBE directory, through print and electronic means, to the widest feasible universe of potential prime contractors; and

(9) Assisting DBEs, and other small businesses, to develop their capability to utilize emerging technology and conduct business through electronic media.

[49 C.F.R. § 26.51(b).]

Recipients must make a projection of what percentage of their goal will be met by race-neutral means and "establish contract goals to meet any portion of [the] overall goal" that will not be met using race-neutral means.  49 C.F.R. § 26.51(c) and (d).  The contract goals are to be established only on USDOT-assisted contracts with subcontracting possibilities.  49 C.F.R. § 26.51(e).

**NJ TRANSIT PROGRAM**

As a recipient of funds, Defendant NJ Transit, a "body corporate and politic with corporate succession" and an instrumentality of the State of New Jersey, is required to institute a DBE program as described in 49 C.F.R. § 26.21, *et seq*.  The Office of Business Diversity, a department of NJ Transit, establishes DBE goals "on contracts with subcontracting possibilities

8

prior to the solicitation of a bid." (Def.'s Ex. 54.) As stated above, prior to trial, this Court decided various motions in limine and determined that the trial would only include fiscal year 2010. (Trial Tr. vol. 1, 15.) Therefore, we will only discuss the NJ Transit DBE program as it exists for fiscal year 2010.[3]

NJ Transit relied on the analysis of consultants using formulas contained in the regulations for the establishment of their goals. (Trial Tr. vol. 2, 28, Mar. 9, 2010.) Defendant contracted with the University of Minnesota as its DBE consultant to research the effects of discrimination in procuring contracts for NJ Transit. (Trial Tr. vol. 3, 56, Mar. 10, 2010.) Dr. Samuel L. Myers, Jr., an economist with the University of Minnesota, served as the principal investigator for the project and authored the Disparity Study for 2002[4] ("Study"). (Trial Tr. vol. 6, 149, Mar. 22, 2010).

The Study established the effects of past discrimination by looking at the disparity in the utilization of DBEs compared to their availability in the market. (Pls.' Ex. 1 at 27.) The disparity ratio was calculated by dividing the DBE availability by DBE utilization with a ratio of one indicating no disparity. (Pls.' Ex. 1 at 26-27.) The Study used several data sets and averaged the findings in order to calculate this ratio, including: (1) the New Jersey DBE vendor List; (2) a Survey of Minority-Owned Business Enterprises (SMOBE) and a Survey of Women-Owned Enterprises (SWOBE) as determined by the U.S. Census Bureau; and (3) detailed contract files for each racial group. (Pls.' Ex. 1 at 27.)

---

[3] Reports from other years will only be discussed in regard to how they pertain to fiscal year 2010.

[4] The Disparity Study was commissioned by NJ Transit to understand what discrimination existed in their contract procurements for construction projects.

The Study examined NJ Transit figures for DBE utilization from fiscal year 1995 to fiscal year 2000.  The rates yielded an average annual utilization of 23 percent, which equals the utilization rate used in the calculations.  (Pls.' Ex. 1 at iii.)  To examine past discrimination, several analyses were run to measure the disparity among DBEs by race.  The Study found that all but one category was underutilized.  (Pls.' Ex. 1 at 28.)  Asian DBEs were not underutilized, while Hispanic DBEs, Black DBEs, and women-owned business enterprises (WBEs) were all underutilized.  (Pls.' Ex. 1 at 28.)  Specifically, the Study found that among Black DBEs there was an 84 percent disparity between the number of Black DBEs utilized and the number of Black DBEs available in New Jersey.  (Pls.' Ex. 1 at 28.)  Similarly, Hispanic DBEs experienced a .85 disparity ratio and WBEs experienced a .20 disparity ratio.  (Pls.' Ex. 1 at 28.)  Asian DBEs, at 1.31, were utilized at a rate that was higher than the number available in New Jersey.  (Pls.' Ex. 1 at 28.)  The overall disparity ratio for all DBEs utilized compared to the percentage available was .46.[5]  (Pls.' Ex. 1 at 28.)

These tests, conducted to establish a pattern of discrimination against DBEs, proved that discrimination occurred against DBEs during the pre-qualification[6] process and in the number of contracts that are awarded to DBEs.  (Pls.' Ex. 1 at 29.)  DBEs are more likely than non-DBEs to

------

[5] It is worth noting that the "number of contracts" used as a denominator to calculate the disparity ratio for the detailed file contracts may be over-estimating or under-estimating the outcomes due to the absence of contracts from earlier years and the difficulty in retrieving contract files for small contracts awarded. (Pls.' Ex. at 28-29). Due to the difficulty in retrieving the missing files, the study focused only on Construction, Professional Services, Supplies & Equipment and the Hudson-Bergen Light Rail project. (Pls.' Ex. at 35-36.)

[6] Pre-qualification means that a DBE or non-DBE has demonstrated by experience that it has the ability to perform on large-scale projects, such as construction, architectural design or engineering projects, and the Procurement Office at NJ Transit will give that entity a higher rating.  (Trial Tr. vol. 5, 44, Mar. 12, 2010; *see also* Trial Tr. vol. 2, 62, Mar. 9, 2010.)

be pre-qualified for small construction contracts, but are less likely to pre-qualify for larger construction projects.  (Pls.' Ex. 1 at 34.)  For example, "had DBEs been treated like non-DBEs, 11 percent would have been rated at the high levels [for contracts] of M through Q, instead of the actual 3.9 percent rated at that level."  (Pls.' Ex. 1 at 34.)  The continuous discrimination against prime DBE contractors resulted in DBE contractors receiving around $109,000 less than non-DBE contractors.  (Pls.' Ex. 1 at 34.)  In summary, "the loss for DBEs as a result of differential treatment far exceeds [the] gain for non-DBEs." (Pls.' Ex. 1 at 40.)

For fiscal year 2010, Dr. Myers followed the three-step process pursuant to USDOT regulations to establish the NJ Transit DBE goal.  (Pls.' Ex. 10 at 2.)  Myers' findings are detailed in a report titled "Final Recommendation for Establishing New Jersey Transit's FY 2010 DBE Goals" ("Final Recommendations Report").  (Pls.' Ex. 10.)  First, Dr. Myers determined "the base figure for the relative availability of DBEs in the specific industries and geographical market from which DBE and non-DBE contractors are drawn."  (Pls.' Ex. 10 at 2.)  In determining the base figure, Dr. Myers (1) defined the geographical marketplace, (2) identified "the relevant industries in which NJ Transit contracts," and (3) calculated "the weighted availability measure."  (Pls.' Ex. 10 at 3-11.)

Dr. Myers used political jurisdictional methods and virtual methods to pinpoint the location of contracts and/or contractors for NJ Transit, and determined that the geographical market place for NJ Transit contracts included New Jersey, New York, and Pennsylvania.  (Pls.' Ex. 10 at 2-4.)  Next, Dr. Myers used contract files obtained from the Office of Business Diversity and data obtained from Dun & Bradstreet to identify the industries with which NJ Transit contracts in these geographical areas.  (Pls.' Ex. 10 at 5; T1 at 29.)  He then used existing and estimated expenditures in these particular industries to determine weights corresponding to

NJ Transit contracting patterns in the different industries for use in the availability analysis.[7]
(Pls.' Ex. 10 at 5.)

The availability of DBEs[8] was calculated by using the following data:  Unified

Certification Program (UCP) Business Directories for the states of New Jersey, New York, and

Pennsylvania; NJ Transit Vendor List; Dun & Bradstreet database; 2002 Survey of Small

Business Owners; and NJ Transit Pre-Qualification List.  (Pls.' Ex. 10 at 5.)  The availability

rates were then "calculated by comparing the number of ready, willing, and able minority and

women-owned firms in the defined geographic marketplace to the total number of ready, willing,

and able firms in the same geographic marketplace."  (Pls.' Ex. 10 at 5.)  The availability rates in

each industry were weighed in accordance with NJ Transit expenditures to determine a base

figure.  (Pls.' Ex. 10 at 6-8.)

Second, Dr. Myers adjusted the base figure due to "evidence of discrimination against

DBE prime contractors . . . [and] disparities in small purchases and construction pre-

qualification."  (Pls.' Ex. 10 at 1.)  The discrimination analysis examined discrimination in small

purchases, discrimination in pre-qualification, two regression analyses, an Essex County

disparity study, market discrimination, and previous utilization.  (Pls.' Ex. 10 at 18-21.)  The

Final Recommendations Report noted that "there are sizeable differences" in the small purchases

---

[7] The availability measure must be weighed in order to ensure that DBE estimates are confined to relevant industries.  (Trial Tr. vol. 7, 28, Mar. 24, 2010.)

[8] Prior to participation in the DBE program, a firm must submit an application to NJ Transit and be certified as a DBE in accordance with federal regulations.  (Def.'s Ex. 54 at 14.)

awards to DBEs and non-DBEs with the awards to DBEs being significantly smaller.[9]  DBEs were also found to be less likely to be pre-qualified for contracts over $1 million in comparison to similarly situated non-DBEs.  (Pls.' Ex. 10 at 14.)  The regression analysis using the dummy variable method "yielded an average estimate of a discriminatory effect of -28.80 percent." (Pls.' Ex. 10 at 14.)  The discrimination regression analysis using the residual difference method "showed that on average 12.2 percent of the contract amount disparity awarded to DBEs and non-DBEs is unexplained."  (Pls.' Ex. 10 at 15.)

In addition, Dr. Myers also considered other evidence of discrimination in the local market in accordance with 49 C.F.R. § 26.45(d).  (Pls.' Ex. 10 at 17.)  The Final Recommendations Report cited the 2005 Essex County Disparity Study prepared by the University of Minnesota and Rutgers University-New Brunswick.  (Pls.' Ex. 10 at 17.)  The report "suggests that discrimination in the labor market contributes to the unexplained portion of the self-employment, employment, unemployment, and wage gaps" in Essex County, New Jersey.[10]  (Pls.' Ex. 10 at 17.)  Finally, Dr. Myers examined previous utilization and recommended that NJ Transit focus on increasing the number of DBE prime contractors.  (Pls.' Ex. 10 at 19.)  Because qualitative evidence is difficult to quantify, as the Final Recommendations Report indicated and Dr. Myers explained at trial, only the results from the regression analyses were used to adjust the base goal.  (Pls.' Ex. 10 at 20-21; Trial Tr. vol. 7, 34-39.)  The base goal was then adjusted from 19.74 percent to 23.79 percent.  (Pls.' Ex. 10 at 21.)

---

[9] The vast majority of small purchases contracts given to DBEs were awarded to one firm.  (Pls.' Ex. 10 at 13.)

[10] Essex County has "one of the largest concentrations of minorities in New Jersey" and is the location of NJT's headquarters.  (Pls.' Ex. 10 at 17.)

13

Third, the regulations require a determination of what percentages of the goal may be accomplished by race-neutral and race-conscious methods.  (Trial Tr. vol. 7, 35.)   In order to partition the DBE goal, Dr. Myers analyzed the share of all DBE contract dollars won with no goals.  (Trial Tr. vol. 7, 36.)  He also performed two different regression analyses.  One involving predicted DBE contract dollars and DBE receipts if the goal was set at zero.  (Pls.' Ex. 10, 192; Trial Tr. vol. 7, 37.)  The second method utilized predicted DBE contract dollars with goals and predicted DBE contract dollars without goals to forecast how much firms with goals would receive had they not included the goals.  (Trial Tr. vol. 7, 37; Def.'s Ex. 10 at 192.)  Dr. Myers averaged his results from all three methods to conclude that the fiscal year 2010 NJ Transit race-neutral DBE goal should be 11.94 percent and the race-conscious goal should be 11.84 percent.[11]  (Pls.' Ex. 10 at 22.)

**ADMINISTRATION OF NJ TRANSIT DBE PROGRAM**

Emmett Lewis, Director of Contract Compliance in the Office of Business Diversity for NJ Transit, testified that a contract-by-contract analysis begins with receiving the contract prior to the bid or proposal phase. (Trial Tr. vol. 4, 44, Mar. 11, 2010).  The contract is received by the Office of Business Diversity ("OBD") along with an engineering estimate and technical specifications.  (Trial Tr. vol. 4, 44.)  Based on these documents, the OBD will determine areas

--------

[11] Dr. John Lunn, Plaintiffs' expert economist, also testified and submitted expert reports prior to trial.  (Trial Tr. vol. 6, Mar. 22, 2010.)  According to Dr. Lunn, Dr. Myers's analysis is flawed as the "availability estimates that are provided in the report are inflated" and the race-neutral component has been under-estimated.  (Trial T. vol. 6, 8-9.)  Dr. Lunn's disagreement with Dr. Myers lies in the differences between the methods used by each expert to estimate availability and disparity ratios.  (Trial Tr. vol. 6, 11-12.)  Dr. Lunn's testimony included an extensive explanation of the measures of availability used by Dr. Myers and he opined that four of the methods used by Dr. Myers, particularly the Dun & Bradstreet database and the 2002 Survey of Small Business Owners, do not meet the criteria of the regulations.  (Trial Tr. vol. 6, 15-24.)

of DBE participation and establish a DBE goal.  (Trial Tr. vol. 4, 44).  The OBD does not place a

goal on the entire contract, but sets goals for specific portions that are conducive to DBE

participation.  (Trial Tr. vol. 4, 88.)  The OBD is able to determine which types of work in a

contract are good fits for DBE participation by matching the industries to "vendors that perform

the same type of work based on the [] codes in [NJ Transit's] database."  (Trial Tr. vol. 4, 52.)

While the OBD will identify industries where DBE participation is possible, it does not identify

specific portions of a contract that a prime contractor should give to DBE.  (Trial Tr. vol. 4, 53.)

The prime contractor determines what portions of the contract will be let out to subcontractors.

(Trial Tr. vol. 4, 53.)  If the OBD establishes a DBE goal for a project, then the OBD will attach

a bidder's list and a recommended goal to the proposal and submit it to the Procurement Office.

(Trial Tr. vol. 3, 7.)

       During the internal review of a contract, NJ Transit's project is advertised to the public.

(Trial Tr. vol. 4, 77.)  Mr. Lewis testified that if the project is only a proposal, NJ Transit will

hold a pre-proposal conference to which all potential bidders are invited.  (Trial Tr. 4, 77.)  At

pre-proposal conferences, during which NJ Transit explains the contract requirements, the OBD

will go over the DBE requirements for the proposal.  (Trial Tr. vol. 4, 77.)  After that point,

prime contractors send in their bids to NJ Transit.

       Once the OBD sets the DBE goals for a contract, the office sends out a list of DBEs to all

prime contractors seeking the contract.  (Trial Tr. vol. 4, 84.)  The prime contractor may consult

that list to hire DBE subcontractors.  (Trial Tr. vol. 4, 84.)  If the prime contractor was

unsuccessful in hiring DBE subcontractors for a project with DBE goals, the prime contractor

must make a showing of good faith.  (Trial Tr. vol. 4, 85.)  The prime contractor must

15

demonstrate that it advertised its contract to DBEs and show quotes it received from DBEs to prove that it was in contact with DBEs.  (Trial Tr. vol. 4, 85.)

Jan Walden, the former Director for the Office of Business Diversity, testified as to NJ Transit's compliance under 49 C.F.R. § 26.51, which requires recipients of federal funding to use race-neutral methods in increasing DBE participation on its projects.  *See* 49 C.F.R § 26.51(a). Ms. Walden stated that NJ Transit would host special meetings specifically targeting DBE firms in the geographic area.  (Trial Tr. vol. 2, 89.)  At these pre-proposal or pre-bid meetings, DBEs have the opportunity to participate in question and answer sessions.  (Trial Tr. vol. 2, 89-90.) Staff from the Procurement Office, which is responsible for reviewing proposals, and engineers would attend in order to clearly explain the project to potential DBEs.  (Trial Tr. vol. 2, 89.)  The meetings would be held at times that were convenient for DBE firms.  (Trial Tr. vol. 2, 89.)  In addition, the OBD attached non-discrimination clauses to its advertisements and newspaper articles.  (Trial Tr. vol. 2, 90.)

Thomas Woods, Chief of Procurement and Support Services, testified that NJ Transit would provide assistance to DBE firms seeking to win bids on capital projects by helping these firms overcome their inability to obtain bonding or financial backing on a project.  (Trial Tr. vol. 5, 43.)  Lastly, as part of its effort to achieve race-neutral methods, NJ Transit published its projects on NJ Transit's website and in foreign language publications directing potential firms to the OBD.  (Trial Tr. vol. 9, 22, Mar. 26, 2010; Trial Tr. vol. 2, 46-48.)

## CONCLUSIONS OF LAW

The standard of review for racial classifications under the Equal Protection Clause of the Fourteenth Amendment is always strict scrutiny.  *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 222 (1995).  Under the strict scrutiny analysis racial classifications must serve a compelling

governmental interest and must also be narrowly tailored to further that interest.  *Adarand Constructors*, 515 U.S. at 227.   This Court already decided, in the course of summary judgment, that compelling interest was satisfied as New Jersey was entitled to adopt the federal government's compelling interest in enacting TEA-21 and its implementing regulations.  *GEOD v. N.J. Transit Corp.*, 678 F. Supp. 2d 276, 282 (D.N.J. 2009).  Therefore, this discussion will only address whether NJ Transit's DBE program is narrowly tailored to further that compelling interest in accordance with "its grant of authority under federal law."  *See Northern Contracting, Inc. v. Illinois Dep't of Transp.*, 473 F.3d 715, 722 (7th Cir. 2007).

**Northern Contracting, Inc. v. Illinois**

To clarify the opinion issued by this Court on August 9, 2009 regarding summary judgment, this Court agrees with the holding in *Northern Contracting, Inc. v. Illinois*, that "a challenge to a state's application of a federally mandated program must be limited to the question of whether the state exceeded its authority."  473 F.3d at 721.  The Seventh Circuit explained that when a state department of transportation "is acting as an instrument of federal policy," a plaintiff "cannot collaterally attack the federal regulations through a challenge to" a state's program.  *Id.* at 722.  Therefore, the "inquiry is limited to the question of whether [the state department of transportation exceeded its grant of authority under federal law."  *Id.*; *see also Tenn. Asphalt Co. v. Farris*, 942 F.2d 969, 975 (6th Cir. 1991) (declining to hold that Tennessee "violate[ed] section 1 of the Fourteenth Amendment by participating in [a] federally initiated preferential scheme without making the 'particularized findings' of discrimination required for a race-conscious program to be initiated by a state or local government").

The holding and analysis in *Northern Contracting* does not contradict the Eighth Circuit's analysis in *Sherbrooke Turf, Inc. v. Minnesota  Department of Transportation*, 345 F.3d

17

964, 970-71 (8th Cir. 2003).  The Eighth Circuit stated that the inquiry as to whether a federal

government program has a compelling government interest is national in scope, however for a

race-based program to be narrowly tailored "a *national* program must be limited to those parts of

the country where its race-based measures are demonstrably needed."  *Sherbrooke Turf*, 345 F.3d

at 971 (emphasis in original).  In this regard, "the federal government delegates" the tailoring

function to the State.  *Id.* at 971.  The court used that particular language in its examination of

whether the federal DBE program survived strict scrutiny.  *See id.* at 970-73.  However, the

court's discussion of whether the DBE programs as implemented by Minnesota and Nebraska

were narrowly tailored focused on whether the states were following the USDOT regulations.

*See id.* at 973-74. (noting that "under the revised federal program, states "set their own goals,

based on local market conditions; their goals are not imposed by the federal government nor do

recipients have to tie them to any uniform national percentage" (quoting 64 Fed. Reg. 5096,

5102 (Feb. 2, 1999))).  Therefore, "only when the state exceeds its federal authority is it

susceptible to an as-applied constitutional challenge."  *Western States Paving Co., Inc. v. Wash.

State Dep't of Transp.*, 407 F.3d 983 (9th Cir. 2005) (McKay, C.J.) (concurring in part and

dissenting in part) ((clarifying that the Eighth Circuit "was concerned with whether the

individual state followed the appropriate regulations, *not* with whether there was sufficient

information to establish past discrimination within the state") (emphasis in original) (citing

*Sherbrooke Turf*, 345 F.3d at 970-71)); *see also S. Fla. Chapter of the Associated Gen.

Contractors v. Broward County*, 544 F. Supp. 2d 1336, 1341 (S.D. Fla. 2008).

      The initial burden of proof falls on the government but once the government has

presented proof that its affirmative action plan is narrowly tailored, "the party challenging the

affirmative action plan bears the ultimate burden of proving that the plan is unconstitutional."

*Majeske v. Chicago*, 218 F.3d 816, 820 (7th Cir. 2000); *see also Sherbrook Turf*, 345 F.3d at 971

(stating that plaintiffs "have the ultimate burden of establishing that the DBE program is not

narrowly tailored).

The basis of Plaintiffs' argument is that NJ Transit's "DBE program is constitutionally

defective because it is not 'narrowly tailored' because it includes in the category of DBEs to

which a percentage of subcontracts must be awarded racial or ethnic groups as to which it has no

evidence of past discrimination." (Pls.' Proposed Findings of Fact at 41).  GEOD contends the

following: (1) NJ Transit's DBE Program is "over-inclusive"  because it includes Asians, a

group that has not suffered discrimination in NJ Transit's market; (2)  NJ Transit has failed to

implement program alternatives that are either race-neutral or less burdensome to non-minority

contractors; (3)  NJ Transit's DBE program is not narrowly tailored because race-neutral

alternatives exist; (4) NJ Transit's expert has identified "societal discrimination"; (5)  NJ

Transit's fiscal year 2010 DBE goals are not correctly calculated; (6)  NJ Transit's DBE goals

for fiscal year 2010 are not narrowly tailored because they do not reflect NJ Transit's market; (7)

the baseline DBE availability as calculated by NJ Transit is inflated as Dr. Myers did not use

appropriate methods for his calculations; (8) adjustments to the baseline DBE availability are

incorrect because there is no evidence of "continuing effects of past discrimination"; (9)  Dr.

Myers's regression analyses do not provide evidence of discrimination; (10) NJ Transit

miscalculated race-neutral attainment; (11) Dr. Myers's methodologies are not based on the

realities of NJ Transit's market.  (Pls.' Proposed Findings of Fact at 47-76.)

Most of GEOD's arguments can be summarized as questioning whether NJ Transit has

presented "demonstrable evidence of the availability of ready, willing and able DBEs" as

required by 49 C.F.R. § 26.45.  As stated above, step one of the goal setting process requires that

19

the recipient determine "a base figure for the relative availability of DBEs."  26 C.F.R. §

26.45(c).  Defendant began this process with the 2002 disparity study that examined past

discrimination and found that all of the groups listed in the regulations were underutilized with

the exception of Asians.  In calculating the fiscal year 2010 goals, Dr. Myers used contract files

and data from Dun & Bradstreet to determine the geographical location corresponding to NJ

Transit contracts and then further focused that information by weighting the industries according

to NJ Transit's use.

Defendant's expert, Dr. Myers, then used various methods to calculate the availability of

DBEs including:  Unified Certification Program (UCP) Business Directories for the states of

New Jersey, New York, and Pennsylvania; NJ Transit Vendor List; Dun & Bradstreet database;

2002 Survey of Small Business Owners; and NJ Transit Pre-Qualification List.  NJ Transit only

utilized one of the examples listed in 49 C.F.R. § 26.45(c), the DBE directories method, in

formulating the fiscal year 2010 goals.  However, the regulations state that the "examples are

provided as a starting point for your goal setting process" and that the "examples are not

intended as an exhaustive list."  46 C.F.R. § 26.45(c).  In addition, the regulations clarify that

"other methods or combinations of methods to determine a base figure may be used, subject to

approval by the concerned operating administration."  49 C.F.R. § 26.45(c).

Although the fiscal year 2010 goals had not been approved at the time of the trial, NJ

Transit has used these methods in setting goals for prior years as demonstrated by the reports for

2006 and 2009.  In addition, the Seventh Circuit held that a custom census, the Dun & Bradstreet

database, and the Illinois Department of Transportation's list of DBEs were an acceptable

combination of methods with which to determine the base figure for TEA-21 purposes.

*Northern Contracting*, 473 F.3d at 718.

In affirming a district court's determination that the Minnesota Department of Transportation's DBE program was narrowly tailored, the Eighth Circuit pointed out that the plaintiffs in that case attacked the reliability of the defendant's data but "failed to establish that better data was available." *Sherbrook Turf*, 345 F. 3d at 973.  Likewise, GEOD's expert, Dr. Lunn, has not convinced this Court that Dr. Myers's data is faulty.  Although Dr. Lunn has provided expert reports throughout this litigation, his testimony at trial did not persuade this Court that Dr. Myers's data or regression analyses were unreliable or that another methods would provide more accurate results.  Simply testifying that other methods of analyses existed, is insufficient to invalidate those analyses relied upon by Dr. Myers.

Step two of the goal setting process permits adjustments to the base figure.  49 C.F.R. § 26.45(d).  The data examined by Dr. Myers is listed in the regulations as proper evidence to be used to adjust the base figure.  *See* 49 C.F.R. § 26.45(d).  This data included evidence from disparity studies and statistical disparities in the ability of DBEs to get pre-qualification.  GEOD contends that NJ Transit has inappropriately used societal discrimination to adjust its base goal, however this argument is inaccurate as Dr. Myers's report clearly states that evidence of societal discrimination is not used to adjust the base goal and that "the adjustment to the goal is based on the discrimination analysis which controls for size of firm and effect of having a DBE goal." (Pls.' Ex. 10 at 18.)

Finally, Defendant had to divide the adjusted goal into race-conscious and race neutral portions.  NJ Transit has to use race-neutral means to meet the maximum feasible portion of its goals.  *See* 49 C.F.R. § 26.51(a).

Courts have further clarified this obligation and indicated that "narrow tailoring does not require exhaustion of every conceivable race-neutral alternative," but instead "require[s] serious,

good faith consideration of workable race-neutral alternatives." *Western States Paving Co., Inc., v. Wash. State Dept. of Trans.,* 407 F.3d 983, 993 (9th Cir. 2005) (quoting *Grutter v. Bollinger,* 539 U.S. 306, 339 (2003)). Although TEA-21 and its implementing regulations were established with an understanding of the need for race-conscious methods, "[o]nly when race-neutral efforts prove inadequate do these regulations authorize a State to resort to race-conscious measures to achieve the remainder of its DBE utilization goal." *Western States Paving,* 407 F.3d at 993-94.

In accordance with 49 C.F.R. § 26.51 (c), NJ Transit has to submit its projection of what portion of the goal will be met by race-neutral and race-conscious means with its overall goal for review to the USDOT. Again, although the fiscal year 2010 goals had not been returned as approved as of trial, Dr. Myers's methods have been used by NJ Transit on previous occasions. (*See* Ex. 6 at 14.) The methods used by NJ Transit also comply with the examples listed in 49 C.F.R. § 26.51, including "arranging solicitations, times for the presentation of bids, quantities, specifications, and delivery schedules in ways that facilitate DBE participation"; providing pre-qualification assistance; implementing supportive services programs; and ensuring distribution of DBE directories.

For the reasons stated above and following the *Northern Contracting, Inc. v. Illinois* line of cases, NJ Transit's DBE program does not violate the United States Constitution as it does not exceed its federal authority. However, this Court also finds that even under the *Western States Paving Co., Inc., v. Washington State Department of Transportation* standard, the NJ Transit program remains constitutional.

**Western States Paving Co., Inc. v. Washington State Department of Transportation**

Although this Court finds that the appropriate inquiry in this case is whether NJ Transit exceeded its federal authority as detailed in *Northern Contracting, Inc. v. Illinois,* for the sake of

22

thoroughness, the facts will also be examined under *Western States Paving Co., Inc., v. Washington State Department of Transportation*.  GEOD relies heavily on *Western States Paving* for their proposition that NJ Transit's "DBE program is constitutionally defective because it is not 'narrowly tailored' because it includes in the category of DBEs to which a percentage of subcontracts must be awarded racial or ethnic groups as to which it has no evidence of discrimination."  (Pls.' Proposed Findings of Fact at 41.)

Under *Western States Paving*, a court must "undertake an as-applied inquiry into whether [the state's] DBE program is narrowly tailored."  407 F.3d at 997.  When determining if an affirmative action program is narrowly tailored, district courts examine "(1) whether such action is necessary to remedy past discrimination [and] the efficacy of alternative remedies; (2) flexibility and duration of the relief, including the availability of waiver provisions; (3) the relationship of the numerical goals to the relevant labor market; and (4) the impact of the relief on the rights of third parties."  *Newark Branch, NAACP v. Harrison*, 940 F.2d 792, 807 (3d Cir. 1991) (quoting *United States v. Paradise*, 480 U.S. 149, 171 (1986)).

 Under the first prong above, "a remedial program is only narrowly tailored if its application is limited to those minority groups that have actually suffered discrimination." *Western States Paving*, 407 F.3d at 998 (holding that "a disparity between the proportion of DBE firms in the State [] and the percentage of contracting funds awarded to DBEs on the race-neutral contracts" was "insufficient, standing alone, to establish the existence of discrimination against DBEs").  This Court acknowledges that according to the 2002 Final Report, the ratios of DBE utilization to DBE availability is 1.31.  (Pls.' Ex. 1 at 27-28.)  However, GEOD's argument fails as the facts in *Western States Paving* are distinguishable from those of NJ Transit.  NJ Transit did get complaints, i.e. anecdotal evidence, of the lack of opportunities for Asian firms.  (Trial

Tr. vol. 2, 98.)  NJ Transit employees, Walden and Sanders, testified that Asian firms informally and formally complained of a lack of opportunity to grow and indicated that the DBE program was assisting with this issue.  (Trial Tr. vol. 2, 98; Trial Tr. vol. 3, 54-55; Trial Tr. vol. 4, 7.)  In addition, GEOD's expert, Dr. Lunn, conceded that Asian firms have smaller average contract amounts in comparison to non-DBE firms.  (Trial Tr. vol. 6, 84.)  GEOD relies solely on the utilization rate as evidence that Asians are not discriminated against in NJ Transit contracting. This is insufficient to overcome Dr. Myers's determination that discrimination did exist against Asians and thus this group was properly included in the DBE program.

GEOD further argues that the first step of the narrow tailoring analysis is not met because NJ Transit focuses its program on sub-contractors when NJ Transit's expert has identified "prime contracting" as the area in which NJ Transit procurements evidence discrimination.  (Pls.' Proposed Findings of Fact at 51.)  According to Plaintiffs, this constitutes a failure to use race-neutral alternatives and suggests that NJ Transit unbundle the contracts to provide more opportunities to sub-contractors.   "'Narrow tailoring does not require exhaustion of every conceivable race-neutral alternative' but it does require 'serious, good faith consideration of workable race-neutral alternative.'"  *Sherbrook Turf*, 345 F.3d at 972 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003)).  In its efforts to implement race-neutral alternatives, NJ Transit has attempted to break larger contracts up in order to make them available to smaller contractors and continues to do so when logistically possible and feasible to the procurement department.  (Trial Tr. vol. 2, 83-84.)

The second prong will not be addressed as it is not questioned by GEOD.   This Court is also satisfied that the third prong, "the relationship of the numerical goals to the relevant labor market," has been discussed extensively above.  Finally, under the fourth prong, the court must

24

address the impact on third-parties. *Newark Branch, NAACP v. Harrison*, 940 F.2d at 807. Placing a burden on third parties is not impermissible as long as that burden is minimized. *Western States Paving*, 407 F.3d at 995. Instances will inevitably occur where non-DBEs will be bypassed for contracts that require DBE goals. *Western States Paving*, 407 F.3d at 994. However, TEA-21 and its implementing regulations contain provisions intended to minimize the burden on non-DBEs. *Western States Paving*, 407 F.3d at 995. The Ninth Circuit found that the inclusion of regulations allowing firms that were not presumed to be DBEs to demonstrate that they were socially and economically disadvantaged and thus qualified for DBE programs as well as the net worth limitations were sufficient to minimize the burden on DBEs. *Western States Paving*, 407 F.3d at 995. Plaintiffs here have not provided evidence that NJ Transit is not complying with implementing regulations designed to minimize harm to third parties.

Even if this court utilized the as-applied narrow tailoring inquiry set forth in *Western States Paving*, NJ Transit's DBE program would not be found to violate the United States Constitution as it is narrowly tailored to further a compelling governmental interest.

## **CONCLUSION**

For the reasons discussed above, this Court holds that Defendant, NJ Transit, has not violated the Fourteenth Amendment through its implementation of TEA-21 and accompanying regulations.

**S/SUSAN D. WIGENTON, U.S.D.J.**

Orig: Clerk

cc: Madeline Cox Arleo, U.S.M.J.

25